FILED & ENTERED

JUN 08 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY ngo          DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No.:        8:05-bk-13972-TA |
| Trigem America Corporation, | Adversary No.: 8:07-ap-01140-TA |
| | Chapter: 11 |
| | STATEMENT OF DECISION ON MOTIONS FOR SUMMARY JUDGMENT |
| Debtor(s), | |
| Keith F Cooper | Date:  April 8, 2010 |
| Plaintiff(s), | Time:  2:00 p.m. |
| | Location:  5B |
| vs. | |
| Centar Investments (Asia) LTD,  CQS Convertible & Qualitative Strategies Master Fund,  Credit Suisse (Hong Kong) Limited, Credit Suisse International,  Credit Suisse Securities (Europe) Limited,  Stark Asia Master Fund LTD | |
| Defendant(s). | |

The trustee's and defendants' cross motions for summary judgment were heard April 8, 2010.  After oral argument the Court took the motions under submission.  This case requires an analysis of the elements of fraudulent conveyance as may be affected by the "earmarking doctrine" as well as by the statutory safe harbor for swap agreements found at 11 U.S.C. § 546(g).  As may be relevant to this decision, the facts are not substantially in dispute.  The following is a very condensed summary of the facts.

## 1.    Facts

TriGem Computer, Inc. ("TGI") was a Korean computer manufacturer and publicly-traded company on the Korean Stock Exchange ("KSE").  TriGem America Corporation ("TGA"), a wholly owned subsidiary of TGI, was established as a California Corporation in 1991.   TGA acted as the distributor in North America of TGI's computers.  On April 13, 2004, TGI issued zero-coupon convertible bonds ("Original Bonds") to the defendants, certain investors represented by defendants Credit Suisse International, Credit Suisse (Hong Kong) Ltd. and their affiliates (collectively "bondholders").  The Original Bonds matured and were due April 14, 2008.  The Original Bonds also had a "put" provision such that prior to maturity at the option of the holders the bonds could be presented to TGI for redemption at ascending percentages of par on scheduled dates; 104.5% of par was available on the scheduled redemption date of April 14, 2005.

In early 2005, TGI's business was falling off steeply and its business relationships with major customers, such as Hewlett Packard and Gateway, were rapidly deteriorating.  On March 11, 2005, TGI was warned by the KSE that its stock would be placed under special supervision (in Korean *gwarijongmok*) due to a precipitous decline in TGI's capital ratio; however the KSE gave TGI until March 31, 2005, to increase its capital ratio so as to avoid *gwarijongmok*. Facing plummeting stock values and the prospect of impending exercise of the "put" from the Bondholders, which would have severely exacerbated TGI's dwindling cash

position if the bonds were redeemed,  TGI asked the Bondholders represented by defendant Credit Suisse International to convert their Original Bonds to mandatory convertible bonds without a put option.  TGI's stated plan was to sell the TGI stock within two to three months thereafter, at a hopefully recovering price after *gwarijongmok* was avoided. There is much dispute over whether there was any realistic prospect at that point of TGI stock retaining any value, much less gaining value.  Moreover, the bondholders demanded a substantial portion of the price in cash as "security" in case sufficient prices were not achieved on the stock after the conversion.  As it happened, trading in TGI stock was suspended shortly after these transactions.  This plan was memorialized in "Confirmation Agreements," which were designated as "swap agreements" on International Swaps and Derivatives Association confirmation forms. These "swaps" were documented at a total price of $23.8 million.  There is also considerable dispute whether these were really "swaps," or were instead disguised guarantees because of their allegedly one-sided nature, since it seems in retrospect that the ultimate holder of the TGI common stock had comparatively little chance of doing better than the holder of the cash position at the end of March, 2005.

Because of concern over potential delays of as much as thirty days in working with the Bank of Korea (which apparently regulated fund transfers to foreign entities from TGI), and considering the strict March 31 deadline and the "put" coming due April 14, TGI orchestrated the transfer of funds to the Bondholders through TGA, which would be subject to different regulations and was not dependent on the Bank of Korea.  TGA, acting by its recently appointed CEO Brian Yoon[1], agreed to enter into the Confirmation Agreements with the bondholders March 24, 2005.  Immediately after receiving $15.6 million by wire from TGI to TGA's account, and after TGA borrowed $2 million from Comprehensive Computer Services, Inc. ("CCS")[2] arranged by TGI (this transaction was essentially a delayed payment owed by

---

[1] Mr. Yoon had apparently been brought in by TGI to help run TGA only a few months earlier.
[2] CCS was apparently a warranty/repair entity previously a part of TGA which was spun off as a nominally separate corporation.  However, it was entirely dependent on TGI and TGA for its business.

CCS to TGI as TGI could not immediately pay the full $17.6 million amount), and using another $250,000 of TGA's own cash, TGA transferred the aggregate of $17.85 million called for in the Confirmation Agreements to the Bondholders on March 24, 2005, as instructed by TGI. This is the transfer that the Trustee now attacks as a fraudulent conveyance ("challenged transfer"). Per the Confirmation Agreements, and after receipt of this "Initial Exchange," the Bondholders amended the bonds on March 25, 2005. TGA was instructed by TGI to mark the receipt of the $15.6 million as payment on account of an $88 million inter-company receivable owed by TGI to TGA. The CCS borrowing was repaid to TGA by TGI on April 26, 2005, and likewise TGA recorded this as collection of part of its "due from parent "account receivable.

TGA had no immediate expectation of receiving the funds but for the transaction with the Bondholders.[3] After the Initial Exchange, the Bondholders made requests to TGA and TGI for the additional payments (the difference between $17.9 million and $23.8 million); however the bondholders did not receive any additional payments from either company as TGI's and TGA's financial positions collapsed. On May 18, 2005, TGI filed a bankruptcy/receivership proceeding in Korea and on June 3, 2005, TGA filed its Chapter 11 bankruptcy petition in California. Upon TGI filing its receivership proceedings, the Bondholders could no longer sell the remainder of TGI stock on the public market at any price. Additionally, it was TGI's bankruptcy in Korea that caused TGA to file its own bankruptcy petition in California.

## 2.    Standards for Summary Judgment

FED. R. BANKR. P. 7056 makes FED. R. CIV. P. 56 applicable in bankruptcy proceedings. Rule 56(c) provides that, after adequate time for discovery and upon motion, the trial judge shall grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505 (1986). A party seeking summary judgment bears the initial

---

[3]  Indeed, TGA actually reportedly owed TGI over $291 million, so debtor was by a large measure the net obligor on inter company receivables.

responsibility of demonstrating the absence of a genuine issue of material fact and establishing that it is entitled to judgment as a matter of law as to those matters upon which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986). Rule 56(e) requires that the non-moving party who opposes the motion go beyond the pleadings and make an affirmative showing through depositions, responses to interrogatories and admissions, that specific facts reveal a genuine issue for trial does exist. *Id.* at 324. Whether a genuine issue of material fact exists turns on whether there is a need for a trial and where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 250. The judge need not make any findings of fact, but must view the evidence presented in a light most favorable to the non-moving party. *Id.* If reasonable minds could differ on the inferences that may be drawn from the factual evidence presented, summary judgment is not appropriate and should be denied. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S. Ct. 1598 (1970).

### 3. The Earmarking Doctrine

The parties raise numerous arguments concerning such issues as whether reasonably equivalent value was received for the challenged transfer, whether the debtor was insolvent or rendered insolvent by reason of the transfer, whether the challenged transfer was part of a scheme and thus made with actual intent to hinder, delay and defraud creditors, or whether, conversely, the transfer was within the statutory safe harbor for swap agreements found at § 546(g), and the like. After careful consideration, the Court has determined that the bulk of this case comes down to a single, pivotal issue. Was it actually an "interest of the debtor in property" that was transferred within the meaning of § 548(a)(1), or related law, such that the trustee has the power to now avoid that transfer for benefit of creditors? Just as a chain breaks at its weakest link, here the Court concludes that the Trustee's weakest link is that the challenged transfer (except for the sum of $250,000) was actually not of the debtor's property

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

as determined in case law, and therefore the creditors of this estate never had any reasonable expectation of being able to resort to these assets as part of their recovery.  Stated differently, the funds down-streamed from TGI were effectively "earmarked" by the parent, and so the debtor was, as to those sums, effectively merely a conduit of TGI's transaction.  The creditors of TGA therefore have no equitable basis now to recover these for *pro rata* distribution.

In reaching this conclusion, however, the Court analyzes several of the Trustee's arguments which, although appealing and very well presented, are not in the end persuasive. First, the Court has no doubt that these transactions were part of a carefully crafted scheme to evade regulatory authority in Korea. The Court was tempted to simply disregard entirely the earmarking defense under the ancient precept that one seeking the protection of equity must come to court with clean hands. It might be said that these parties to the challenged transfers were just a bit too clever and so should garner little sympathy in their belated appeals to equity.  But in the end the evidence was inconclusive that the challenged transfers were actually illegal under any law, including Korea's.  Moreover, the pivotal issue for the Court was that there was little about this convoluted transaction which actually affected the preexisting, legitimate interests of debtor's creditors, and so the Court resolves that it could not determine that defendants came to court with unclean hands.  But the Trustee raises several other important arguments, each of which is analyzed below.

### A.  Property of the Debtor and The Pay-down of the Inter-Company Receivable

Among the strongest arguments of the Trustee is that the $15.6 million of the challenged transfer, and perhaps the $2 million CCS borrowing as well, should indeed be regarded as the debtor's property for the simple reason that the parties actually documented it as such by recording this as a pay down of the $88 million owed to TGA by TGI.  Ironically,

had TGA and TGI not added this notation to TGA's books, this would have been a rather

obvious case against the Trustee.  But shouldn't the parties' own camouflage now work

against them?  But the Court must  also decide whether this bookkeeping notation makes any

real difference, or similarly, whether because the funds were for a short time actually deposited

into the debtor's account upon which Mr. Yoon clearly had the power (if not the inclination) to

write a check or wire for any other purpose, this should matter.


        Based on a careful reading of the case law, however, the Court concludes that it does

not matter.  This is so because in virtually all of the earmarking cases it could be said that the

debtor had the actual power to ignore the earmarking scheme.  But the theoretical power to

divert the funds elsewhere is apparently not the test; it is just not that simplistic under

established case law.  Where there is an agreement to observe the earmarking and the funds

come into the debtor's possession on the express condition that the earmarked amounts fund

a specific transfer, this is sufficient to invoke the earmarking doctrine.  *Adams v. Anderson (In

re Superior Stamp & Coin Co., Inc.)*, 223 F. 3d 1004, 1010 (9th Cir. 2000).  This is contrasted

with situations where funds are lent but it is the debtor, not the lender, who designates who will

be paid.  *See, e.g., Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries)*, 16 F.3d 313,

316-17 (9th Cir. 1994); *In re Smith*, 966 F.2d 1527, 1533 n.9 (7th Cir. 1992) *cert. dismissed,* 506

U.S. 1030, 113 S. Ct. 683 (1992); *McCuskey v. Nat'l Bank of Waterloo* (*In re Bohlen

Enterprises, Ltd.)*, 859 F.2d 561, 566-67 (8th Cir. 1988).  But the Trustee argues that no written

agreement exists between TGI and TGA regarding how the funds down-streamed from TGI

were to be used.  But this argument ignores the reality not only of this case but of most

earmarking cases and is not determinative.  An oral instruction will suffice. *Ragsdale v. Bank*

*South, N.A. (In re Whiteacre Sunbelt, Inc.*), 206 B.R. 1010, 1019-20 (Bankr. N.D. Ga. February

6, 1997).   Even a mere "understanding" rather than a formal agreement may suffice**.** *Coral*

*Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1359 (5th Cir. 1986).  The Trustee

does not even contest that there was a "common understanding" that TGI would provide the

money for TGA to use to fund the challenged transfers in accord with TGI's instructions.  *See*

'Keith F. Cooper's Separate Statement of Uncontroverted Facts…" ¶¶ 70-80; Bondholders'

"Separate Statement of Uncontroverted Facts…" ¶¶ 69-80 with citations to Lee and Yoon

depositions.  The record is fairly clear that TGA and Brian Yoon were acting under instructions

from TGI to utilize the wired funds from TGI for the sole purpose of funding the transactions

contemplated in the Confirmation Agreements; indeed, the Trustee himself goes to some

considerable length to emphasize that Mr. Yoon and TGA were *completely controlled* by the

parent, TGI, and would clearly not have received the $15.6 million or the $2 million from CCS

arranged by TGI unless TGA agreed to follow instructions. *See* "Keith F. Cooper's Separate

Statement of Genuine Items in Dispute…" ¶¶ 47-50; 60.  So there is no room left for any

argument that there was not an "agreement" regarding distribution of the challenged transfers.

The case authorities make clear that the obvious or incriminating evidence of a "smoking gun"

*written* agreement is not required for earmarking to apply.  Considering the context in which

these issues often arise, such a requirement would be unrealistic.


     It is also necessary to evaluate the Trustee's argument that the Court should regard the

transfer as indeed involving debtor's property because even the parties themselves designated

these transactions as pay downs by TGI on the intercompany receivable.  Thus, the argument

goes, by making these accounting entries the cash wired by TGI became nothing more than

payment of an account and, consequently, clearly the debtor's money.  While there is much to be said for this argument (and while it is always satisfying to see too-clever actors hoisted upon their own petard) in the end the Court is not persuaded.  In correctly evaluating earmarking cases, particularly in a fraudulent conveyance context (see below), it is necessary to look at the transactions as a whole.  The Trustee points to excerpts from Mr. Yoon's deposition where he apparently testified that he believed the receivable from the parent TGI might be paid sometime in 2005; this makes it sound like the intercompany receivable was a solid asset and by the TGI wire it was simply partly liquidated into cash.  *See* "Keith F. Cooper's Separate Statement of Genuine Items in Dispute" ¶¶ 77-79.  Whatever might have been Mr. Yoon's subjective belief, the facts strongly suggest otherwise.  In its Consolidated Financial Statement dated December 31, 2004, TGA reported a "due from parent" receivable of $88,223,598 but a $291,659,000 payable to the parent TGI for goods sold.  Declaration of Delilah Vinzon, Exhibit "3" at pages 00333 and 00335.   In other words, by a three to one margin, TGA was a net inter-company *debtor*.  Given the desperate financial condition of both entities in the first quarter of 2005, TGI's starved cash position and considering that within about 60 days of the challenged transfers both entities were in bankruptcy proceedings, it is very hard to see the intercompany receivable as really debtor's "asset" or the cash wire as "proceeds" within the meaning of the earmarking doctrine.  True, the accounting entry was used as a pretext or a camouflage.  But the Court is persuaded that the defendants' "but for" analysis is the correct one (*See, e.g., In re Barefoot Cottages Development Co.*, LLC, 2009 WL 2842735 *3 (Bankr. N.D. Fla. Jul. 28, 2009)), particularly when evaluating transfer of earmarked funds in a fraudulent conveyance context (see below).   There is no question that "but for": (i) the pressure to improve its capital ratio from the KSE and the impending March 31

deadline; (ii) the impending exercise of the "put" from the bondholders; and (iii) the resulting

decision by TGI to use its subsidiary TGA as a conduit to timely (if temporarily) cure its capital

ratio problem, this "due from parent" receivable would clearly never have been paid in whole or

in part.  As further support for this approach, and as discussed at greater length below, for

similar reasons there was no net diminishment of the estate by reason of this transfer because,

had the attempt to fix TGI's capital ratio not occurred, TGA's ability to recover anything more

from its insolvent parent on account of an intact receivable, particularly in view of its position as

the net debtor, could only have been minimal at most.[4] Evaluated as a whole, the Trustee's

evidence is that both entities were clearly insolvent not only as of the date of the challenged

transfers but for months before.   Moreover, the Court should disregard the camouflage labels

placed on the transactions by the parties in favor of standing back and looking at the entire

substance of what happened.  *See, e.g., Nordberg v. Sanchez (In re Chase & Sanborn Corp.),*

813 F.2d 1177, 1180-82 (11th Cir. 1987) [ Court in evaluating earmarking overrules finding that

deposit account not denominated in debtor's name meant that debtor's funds were not

involved].


**B.  Does/should earmarking apply outside of preference cases in the Ninth
Circuit?**


The Trustee argues that the earmarking doctrine should not apply at all outside of

preference cases.  He bases this argument solely on the lack of reported earmarking cases in

---

[4] The parties did not provide any analysis of whether unsecured creditors enjoyed or expect a dividend in TGI's bankruptcy proceeding on account of general unsecured claims.  However, considering that TGI's much larger "due from subsidiary" receivable *owed by* TGA has also not yet been paid, and since both entities are in bankruptcy, one strains to imagine any scenario in which a net recovery could be made of any portion of the account receivable owed to TGA.

the Ninth Circuit outside of a preference context.  Of course, there are several fraudulent transfer cases from outside of this circuit where the earmarking doctrine as a defense has been carefully discussed and embraced.  *See, e.g.*, *In re Chase & Sanborn Corp.,* 813 F. 2d at 1180-82; *In re A.W. Lawrence & Co.*, 346 B.R. 51, 56-57 (Bankr. N.D.N.Y. 2006); *In re Cambridge Capital Group, Inc.*, 2009 WL 3823185 (Bankr. Col. Nov. 16 2009).  There is always a first case on every issue, and so the lack of a reported fraudulent conveyance earmarking case to date in the Ninth Circuit cannot by itself be considered determinative.

However, the earmarking doctrine as an appropriate defense in both §547 *and §548* cases *was* discussed by the Ninth Circuit in an unauthorized post-petition transfer case under §549. Indeed, the Ninth Circuit in *Aalfs v. Wirum (In re Straightline Invs.),* 525 F.3d 870, 877-78 (9th Cir. 2008) even cited to *Chase & Sanborn* for the principle underlying the earmarking doctrine, i.e. that for any avoidance action to lie there should be a diminution of property of the estate and, conversely, where there is no diminution there should be no avoidance.   The *Straightline* court could simply have proclaimed that earmarking does not apply outside of preference cases, but it conspicuously did not.  While the *Straightline* court declined to expressly decide the issue of whether earmarking also applies in §549 cases, its open discussion of the underlying precept, i.e. *diminishment of property of the estate* as a prerequisite to all avoidance cases, is instructive.  The *Straightline* court ultimately determined that the defendant did not as a factual matter meet the elements of the earmarking test in any event.

To bolster his argument that earmarking should only apply in preference cases, the Trustee cites *Straightline* and similar Ninth Circuit cases which have, in discussing earmarking, included a list of elements of the defense:

> [T]he earmarking doctrine applies 'when a third party lends money
> to a debtor for the specific purpose of paying a selected creditor.'
> *In re Superior Stamp & Coin Co.,* 223 F.3d at 1008 (quoting

*Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries),* 16 F.3d 313, 316 (9th Cir.1994)).[T]he earmarking doctrine requires: "(1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt; (2) performance of that agreement according to its terms; (3) the transaction viewed as a whole ... does not result in any diminution of the estate." *Id. quoting In re Bohlen Enterprises, Ltd.,* 859 F.2d at 566.

*Straightline,* 525 F.3d at 881-82

The Trustee argues that "new lender" and "lends money to a debtor for the specific purpose of paying a selected creditor" and "antecedent debt" only make sense in the context of a preference since a fraudulent conveyance typically does not involve borrowed money or a lender, or even necessarily payment to a creditor; rather, it is usually a transfer of debtor's existing property either with actual intent to hinder, delay or defraud creditors, or under constructively fraudulent circumstances.    But the Trustee reads too much into these lists as each arose in the context of a preference case and so there was no occasion to discuss the doctrine in other contexts.   In the Court's view it is far more illuminating to consider the theoretical underpinnings of the earmarking doctrine.   The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference (or arguably a fraudulent conveyance) must involve a "transfer of an interest of the debtor in property." *In re Bohlen Enterprises Ltd.*, 859 F.2d at 565.   But "transfer of an interest of the debtor in property" is equally a statutory requirement of an action under §548(a)(1) as it is for preferences.   If creditors have no other right or expectation of resort to property which has been transferred to a debtor for an earmarked purpose, then why should it matter that the theory of avoidance of that property's transfer is in preference or fraudulent conveyance?[5]   In

_____

[5]  The Court acknowledges that some courts within the Ninth Circuit have *in dicta* been reluctant to expand the earmarking doctrine beyond its origins, i.e. where guarantors also liable for the debt advanced the earmarked funds and were provided an equitable defense where requiring a return of the funds might potentially impose liability twice upon the guarantor. *In re Kemp Pac. Fisheries,*16 F.3d 313, 316 n.2 (9th Cir. 1994), *citing In re Bohlen Enterprises, ltd.*, 859 F.2d 561, 565-66 (8th Cir. 1988) and *In re Ludford Fruit Products, Inc.*, 99 B.R. 18, 21 (Bankr. C.D. Cal. 1989).  Whatever force this somewhat distant "reluctance" might bring to bear is outweighed, in the Court's view, by not only evolving case law but by the force of the

1
2
3
4
5
6
7
8
9
10
11
12

both instances what matters is that in an earmark case there is no diminishment of the

estate, and it is that diminishment of assets that would otherwise be available to pay creditors

that is at the heart of all avoidance actions.  *In re Bullion Reserve of N. Am.*, 836 F.2d 1214,

1217 (9th Cir. 1988); *In re Kemp Pac. Fisheries, supra*, 16 F.3d at 316; *In re Bohlen*

*Enterprises*, 859 F.2d at 567.  Reduced to its essence, the earmarking defense merely holds

for the unsurprising conclusion that where creditors would not otherwise have any reason or

expectation to look to the assets transferred, there is no diminution of the net recovery on

account of the earmarked funds and there can therefore be no avoidance.  It is not so much

an affirmative defense as it is a challenge to the trustee's claim that the particular funds are

part of the bankruptcy estate. *Metcalf v. Golden (In re Adbox, Inc.),* 488 F.3d 836, 842 (9th

Cir. 2007).

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here is where the defendants' "but for" analysis seems correct.  But for this conduit

transaction, the debtor would have never touched any part of the "due from parent"

receivable, and given the woefully insolvent position of both debtor and parent in March

2005, and given that TGA was a net debtor in any event and entirely dominated by its parent

as the Trustee concedes, no part of the receivable would ever have been paid or could have

expected to be paid under any reasonable scenario.  The Trustee may argue that the Court

should not engage in "big picture" analysis, and merely focus on the trees and not the forest,

i.e. the money was deposited into an account of the debtor and an intercompany receivable

was debited so property of the debtor was transferred…end of story.  Of a similar vein is the

argument that earmarking only applies in preference actions. But to do this is, in the Court's

view, to ignore not only the case law but, more importantly, the underlying logic and

principles from which the earmarking doctrine evolved.  The Court should look instead at the

big picture and ask, if the debtor was only a conduit and its creditors would not otherwise

have had any reasonable expectation of recovering this money, why should those creditors

underlying principle that, absent a diminishment of the estate, there is no equitable basis for
avoidance in the first place.

receive a windfall now?   From the standpoint of debtor's creditors, in whose behalf the Trustee brings suit, there was no net diminution of expected recovery, which is and must be the touchstone of every avoidance action whether under §§547, 548 or 549.

### 4. The $250,000

But what of the money that both sides agree *was* property of the debtor and whose loss does diminish the recovery of the creditors?  In defense to recovery of this portion defendants argue that either debtor was not insolvent as of March 25, 2005, that reasonably equivalent consideration was received or that in any event the transaction qualifies for a safe harbor under § 546(g).  The Court analyzes these arguments in reverse order.

### A.  The §546(g) safe harbor

Section 546(g) provides that a trustee may not recover a transfer made "in connection with any swap agreement…except under §548(a)(1)(A) of this title."  "Swap agreement" is a defined term under §101(53B).  This section was enacted by Congress to shield markets in ordinary swap arrangements as are created in securities exchanges from instability that might be threatened by unnecessary and inappropriate litigation by bankruptcy trustees seeking to reverse settled transactions. *Kaiser Steel Corp. v. Charles Schwab & Co.*, *(In re Kaiser Steel Corp.)*, 913 F.2d 846, 848 (10th Cir 1990).  However, to avail of the safe harbor, the form of settlement payment must be "commonly used" within the industry.  *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 870 (Bankr. S.D.N.Y. 2005). Congress also had no intent to shield transactions illegal under local law under the cover of a "swap" label. *See Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp)*, 328 B.R. 58, 67 (Bank. S.D.N.Y. 2005), *citing Bear, Stearns Int'l*, 323 B.R. at 876.  In *Bear Stearns* the purported swap violated Oregon law which made transfers from an insolvent corporation to acquire its own shares illegal. *Id.* at 876.  Therefore, such voidable transfers could not qualify

as settlement payments of the kind that would qualify for §546(g) protection.

While not precisely on point, there is much about the transaction at bar that echoes the ruling in *Bear Stearns*. The Court cannot determine from the evidence presented that the down streaming of money by TGI to TGA, and use of TGA as a conduit to give the bondholders the "security" they wanted for amending the put agreement into mandatory convertible bonds, was necessarily illegal under Korean law. But it seems clear enough that it was structured this way to evade Korean regulatory authorities and to bypass strictures imposed by the Bank of Korea, and to disguise TGI's transaction to appear as one made by its wholly owned subsidiary, TGA. Apparently, Korean law requires equality of treatment among shareholders and giving the bondholders (who TGI needed to become shareholders without a put agreement to improve its capital ratio) a guaranteed stock price would have been viewed by Korean authorities as an improper guaranty by TGI to a portion of its shareholder body and thus void. Moreover, had TGI tried to enter into the confirmation Agreements without involving TGA, this likely would also have required Bank of Korea authorization and would likely not have been approved. *See* Y.S. Lee Report ¶¶37-54.

Likewise, the Court does not buy for a moment the defendants' argument that this was just an ordinary swap agreement viewed *from TGA's* standpoint. First, everything was structured by TGI; Mr. Yoon, who signed for TGA, not only did not negotiate it on behalf of TGA, he had no prior experience with swap transactions. Yoon Deposition 222:8-11; 35:9-36; 41: 25-42:5; 218: 10-21; 222:16-19. Moreover, the deal was very one-sided. TGA did not stand to gain anything (apart maybe from a short extension on life by avoiding the parent's immediate *gwarijonmok*) and in fact was obligated to pay the difference between the stock sales (supplemented by the $17.85 million "collateral") and $27.251 million to the bondholders within a period of only two months. TGI's stock price would have had to increase KRW 2,530 to KRW 3,677 per share, over $30.94 million, a 45% increase in only two months for any profit to be enjoyed by TGA, an extremely unlikely scenario given the

precipitous decline in TGI's fortunes in March-May, 2005.    Ultimately, the actual sale of stock

when combined with the $17.85 million collateral yielded only $25.75 million, saddling TGA

with a liability of another $1.52 million to the bondholders.  Trustee's Exhibit 19; Exhibit 14,

Schaeffer Report at App. D and at ¶30; Exhibit 13, Elson Report at 52.  The Court does not

believe that either §546(g) or any of the case law interpreting it can be read to say that the

Court should second guess bad swap agreements made by debtors and re-weigh them with

benefit of hindsight.  Indeed, the purpose of §546(g) is the opposite.  However, as interpreted

in *Bear Stearns* and similar authority, there *is* a requirement that settlement payments be of

the kind ordinarily used within the securities industry.  Almost everything about this

transaction smells of an *ad hoc* attempt to evade the Korean authorities, which, combined

with its manifestly one-sided structure and the fact that it was foisted upon TGA by TGI,

brings it outside of the protection of the statute because it was not the same or similar to

anything commonly used in the securities trade. *Enron*, 328 B.R. at 67, *citing Bear, Stearns*

at 870.  Nor is it any reasonable argument that the Court should merely accept the parties'

designation of the transaction as a "swap agreement" because an International Swaps and

Derivatives Association form was used; it is an ancient precept that equity will disregard

labels and inquire into the substance of a transaction. *Young v. Higbee Co.*, 324 U.S. 204,

209, 65 S. Ct. 594, 597 (1945); *Schering-Plough Corp. v. United States*, 651 F. Supp 2d.

219, 272 (D. N.J. 2009) [swap agreement was in substance a loan]; 27A Am. Jur. 2d "Equity"

§90.


### B.  Solvency


Nor can there be any reasonable argument that TGA was not insolvent as of

March 25, 2005.  Although the presumption of insolvency appearing at § 547(f) only applies

in preference cases, and not in fraudulent conveyance actions, it must be perfectly obvious

that TGA, only 60 days before bankruptcy, was indeed insolvent when the challenged

transfer occurred.  One starts from the fact that TGA was extremely, if not totally dependent

upon TGI for its business, TGI filed a bankruptcy petition within 60 days of the challenged transfer and, having lost its HP and Gateway business entirely, TGI was clearly on the ropes weeks if not months earlier.  TGA filed its petition only a few days after its parent.  Then one considers that an inordinate percentage of TGA's balance sheet was an $84 million note receivable from CCS; but since CCS had lost its TGA-referred HP warranty repair business and therefore had no prospects, its note was consequently of very doubtful collectability as its own officer plainly attests.  Kimm Decl. ¶¶ 6-10.   By simply readjusting the value of the CCS note from $84.1 million to zero on the TGA "adjusted balance sheet," defendants' own expert's valuation that assets exceeded liabilities by about $42 million must completely change.  Instead, TGA was underwater by at least $40 million by reason of this one asset alone.  Exhibit 53, Gordon Klein report at its exhibit 3.  The Court reviewed Mr. Klein's opinion regarding valuations based upon recent audited and unaudited reports and the like, but since the authors of those reports now testify their reports would have been very different had they known the true facts [Exhibit 11, Kiho Choi Declaration ¶¶ 7-13], the Court is given very little comfort that Mr. Klein's report has any grounding in reality.  Similarly, the discussion about "going concern" valuation methodology rings hollow to the Court since we now know with clarity that neither TGA nor CCS (whose note provided one of the few remaining assets on the TGA balance sheet)  actually did much if any business after March 25 and before TGA filed its bankruptcy petition about two months later.  In sum, the Trustee clearly carried his burden of proof on the insolvency issue and defendants fail to raise any cognizable case of solvency in rebuttal.


### 3. Reasonably Equivalent Value


The remaining issue is whether TGA received reasonably equivalent value in return for the challenged transfer.  What did the debtor get for its $250,000?   As described above, the possibility that the TGI stock could have enjoyed a steep turnaround of over 45% on TGI stock in only two months such that the debtor might have enjoyed an actual profit after

remitting to the bondholders under the Confirmation Agreements seems, in retrospect, to be very far-fetched indeed.  Moreover, under the Confirmation Agreements as dictated by TGI, any loss was to be reflected only upon TGA's books.  Of course, this is exactly what happened as a loss of another $1.52 million as a liability was the end result.  While there might be some analogy to gambling cases which hold that the price of a wager must be regarded as reasonably equivalent value [*see, e.g., Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 771 (6th Cir. 1995)], this implies a voluntary decision to sit at the gaming table.  But here TGA had little or no choice in the matter on these steep odds.  Whatever remote prospects there might have been for a 45+% rebound in the TGI stock were exchanged for $250,000 cash at a time when both TGA and TGI were starved for cash, and the exchange was not at the behest of TGA's own management, but by TGI's, and in retrospect it seems perfectly obvious that the transaction was structured entirely for TGI's benefit, not TGA's.

But the defendants argue for an "indirect" benefit, i.e. that by avoiding TGI's *gwarijonmok* TGA, as a largely dependent subsidiary, lived to fight another day (actually, about 68 days).  Indirect benefits can suffice as reasonably equivalent value <u>if</u> they are "fairly concrete and identifiable."  *Official Comm. of Unsecured Creditors of TOUSA v. Citicorp N. Am (In re TOUSA, Inc.),* 422 B.R. 783, 846-50 (Bankr. S.D. Fla. 2009) [subsidiaries who conveyed liens for borrowed funds used for debts for which they were not liable received little or no benefit in merely forestalling the parent's bankruptcy]; *Greenspan v. Orrick, Herrington & Sutcliffe LLP et al (In re Brobeck, Phleger & Harison, LLP)*, 408 B.R. 318, 341 (Bankr. N.D. Cal. 2009) [insolvent law firm's waiver of profits in unfinished business in favor of individual partners did not result in sufficient indirect benefit].  Once the plaintiff makes a *prima facie* showing that no sufficient direct benefit was received in the transaction, it is the defendants' burden to prove sufficient *indirect* benefit that is tangible and concrete.  *In re Brobeck*, 408 B.R. at 340; *In re TOUSA*, 422 B.R. at 844, *citing Pummill v. Greensfelder, Hemker & Gale, P.C. (In re Richards & Conover Steel Co.)*, 267 B.R. 602, 614 (8th Cir. BAP 2001); *see also*

*Clark v. Security Pac. Business* Credit, *Inc. (In re Wes Dor, Inc.)*, 996 F.2d 237, 243 (10th Cir. 1993); *Leonard v. Mountainwest Fin. Corp. (In re Whaley)*, 229 B.R. 767, 775 (Bankr. D. Minn. 1999).   Moreover, the issue of "reasonably equivalent value" is determined from the perspective of the transferor's *creditors* and the court must analyze all the circumstances surrounding the transfer.  *In re Brobeck*, 408 B.R. at 341-42.

    The bondholders do not carry their burden that any value was received for the challenged transfer, direct or indirect.  There is case law suggesting that upstream parent-subsidiary transfers, or transfers on behalf of parent corporations to third parties, are presumed to be for nominal value to the subsidiary absent specific proof to the contrary. *Pajaro Dune Rental Agency, Inc. v. Spitters (In re Pajaro dunes Rental Agency)*, 174 B.R. 557, 577 (Bankr. N.D. Cal. 1994); *Smith v. Am. Founders Fin. Corp.*, 365 B.R. 647, 667 (Bankr. S.D. Tex. 2007).

        As things turned out, we know that both parent and debtor were unable to reverse the irresistible tide of insolvency in the approximate sixty days following the challenged transfers and no showing is made that the debtor was, as a consequence of the transfers, able to conduct any meaningful business that, from its creditors standpoint, could have led to any better recovery.  Indeed, the opposite was true as TGA was saddled with deepening insolvency by the addition of another $1.52 million in liability.  Merely delaying the consequence of insolvency is not a measurable benefit to the subsidiary.  *Leonard v. Norman Vinitsky Residuary Trust (In re Jolly's, Inc.),* 188 B.R. 832, 843 (Bankr. D. Minn. 1995).  While it may be true that this is the view from the clarity of hindsight, it is also true that the burden falls upon the bondholders to show some specific, quantifiable value received by the debtor. The Court is not persuaded that merely delaying the inevitable for two months by itself is reasonably equivalent value; the answer might be different if the bondholders could point to some imminent and concrete chance of a solution that might have come to pass in the ensuing 60 days, if only TGI could stay in business, i.e. some expected contract, sale or

intervention that would have saved the day.  But the Court has seen no evidence of this and those few suggestions that alternative sources of business were on the horizon seem to the Court so vague, ephemeral and insubstantial as to amount to little or nothing.  Certainly they can not be the reasonable equivalent of $250,000 in cash.

## 5.  Conclusion

Based upon the declarations, deposition transcripts and uncontradicted evidence, the Court concludes that no triable issue of material fact remains.  With respect to all but $250,000 of the challenged transfer, the trustee fails to prove that property of the debtor was involved.  Instead, it appears to the Court that the bulk of the challenged transfer was actually TGI's money and TGA acted merely as a conduit.  Viewed from the perspective of TGA's creditors, the creditors had no reasonable expectation of ever seeing any of that money absent the challenged transfer and so it is not equitable that they should recover it now through a fraudulent transfer action.  The Court is persuaded that earmarking has a role to play in fraudulent transfers as well as preference actions, even in the Ninth Circuit.  Concerning the $250,000 however, this was clearly TGA's money and the challenged transfers were clearly made while the debtor was insolvent.  No reasonably equivalent consideration was received in return for the challenged transfer when viewed from the perspective of debtor's creditors.  Therefore, as to the sum of $250,000 a judgment avoiding this transfer from the defendants may be entered in favor of the trustee; otherwise judgment

shall be entered in favor of defendants.  This statement of decision will serve as findings in

the matter under FED. R. CIV. P. 52 made applicable in bankruptcy adversary proceedings in

FED. R. BANKR. P. 7052.  The trustee shall prepare a form of judgment consistent with this

statement of decision.

###

DATED: June 8, 2010

_Theodor C. Albert_
_____
United States Bankruptcy Judge

**TO USERS OF THIS FORM**:

**1)** Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3) Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.
**4) Category II.** below:  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief.  <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify* STATEMENT OF DECISION ON MOTIONS FOR SUMMARY JUDGMENT was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  <u>SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF"</u>)** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of <u>June 8, 2010</u>, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

Aluyah I Imoisili    aimoisili@milbank.com
Jennifer Levin    jlevin@venable.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
Delilah Vinzon    dvinzon@milbank.com
Christopher T Williams    ctwilliams@venable.com, jcontreras@venable.com

☐ Service information continued on attached page

**II.  <u>SERVED BY THE COURT VIA U.S. MAIL:</u>** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

Douglas C Emhoff
Venable LLP
2049 Century Park East Ste 2100
Los Angeles, CA 90067

Fred Neufeld
601 S Figueroa St Ste 3000
Los Angeles, CA 90017

☐ Service information continued on attached page

**III.  <u>TO BE SERVED BY THE LODGING PARTY</u>**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☐ Service information continued on attached page